```
                                              USDC SDNY
                                              DOCUMENT
                                              ELECTRONICALLY FILED
UNITED STATES DISTRICT COURT                  DOC #:
SOUTHERN DISTRICT OF NEW YORK                 DATE FILED 12/29/08
```

-------------------------------------------X

BROADCAST MUSIC, INC.,

                              Petitioner,

             -against-

DMX, INC.,

                              Respondent.

:   **REDACTED**
:   **PUBLIC VERSION**

:

:   08 Civ. 0216 (LLS)

:   **MEMORANDUM and ORDER**

:

-------------------------------------------X

This application for the setting of an interim annual fee to be paid by a member of the commercial music services ("CMS") industry for a Broadcast Music, Inc. blanket license which allows "carve-outs" for direct licenses (an "adjustable fee blanket license") presents two questions: What should the base annual rate for such an adjustable license be? How should the deductions for carve-outs be calculated and administered?

As in all interim applications under the BMI decree,[1] an interim fee is "intended as a temporary measure to ensure a reasonable flow of funds to [the licensor] for the use of copyrighted music while the parties negotiate or litigate a binding fee." United States v. ASCAP (Application of the National Cable Television Ass'n, No. 13-95, 1999 WL 335376, at *3 (S.D.N.Y. May 26, 1999). It is to be set promptly, as a rough, tentative and temporary determination, subject to retroactive adjustment when the

---

[1] United States v. Broadcast Music, Inc., 1966 Trade Cases (CCH) ¶ 71,941 (SDNY 1966), modified by 1966-1 Trade Cases (CCH) ¶ 71,378 (SDNY 1994).

final fee is determined, and may bear little resemblance to the
final fee. <u>United States v. Broad. Music Inc. (In re Music
Choice)</u>, No. 64 Civ. 3787 (LLS), slip. op. (S.D.N.Y. Nov. 15,
1999).

1.

At present DMX pays a blended rate of approximately ▋▋ per
location (stemming from a 20-year old arrangement BMI last extended
in 2005) which it proposes be adopted as representing the current
arrangement between the parties. BMI suggests a rate of $36.36 per
location, the amount to which Muzak, and thereafter all the rest of
DMX's CMS competitors, agreed in their current license agreements
with BMI.

However, because of an allowed "organic growth" of 8% per year
in the number of locations covered by those licenses, the potential
effective rate per location can drop by steps from $36.36 to ▋▋▋
in the final year of the competitors' current licenses, a prospect
viewed by BMI and its expert Bruce M. Owen as reasonable (O'Neill
Dep. 79-81; Owen Dep. 106).

Taking into account Muzak's avoidance of retroactive payments
of ▋▋▋ in the negotiations of its lead contract with BMI for the
2004-2009 period, which set the pattern for the other DMX
competitors, DMX's expert Dr. Amy Candell calculates that with
continued growth in the number of subscribers at 8% each year, the
average effective per-location rate over the five-year period is
between ▋▋▋ and ▋▋▋. BMI argues that taking into account

2

organic growth in the number of locations, its current average per-location rate across all commercial music service providers is over ▆▆ per location.[2] (O'Neill Rebuttal Decl. at ¶ 11.)

For the direct licenses it has obtained, DMX has agreed to pay its direct licensors an annual fee of ▆▆ per service location, with the salient special case of its crucial license with ▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ To obtain that license DMX had to guarantee ▆▆▆▆▆▆▆ during the license's ▆▆▆▆▆▆ term, with a side agreement to pay ▆▆ an additional ▆▆▆▆▆▆▆▆▆. BMI understandably views those side arrangements as proof that the real value of the license is much higher than the base ▆▆ (it says the total ▆▆ payments amount to an annual ▆▆▆ per location), but for present purposes those increments will be treated as a premium DMX had to pay to buy its way into the ▆▆▆ publisher market.

Thus, for the tentative and approximate purposes of an interim fee, it seems reasonable to

(1) Regard the 2004-09 BMI-Muzak agreement as having contemplated the prospect of ▆▆▆ per location as a reasonable fee,

(2) Apply the same analysis to BMI's similar license agreements with the other (except for DMX) members of the CMS industry,

---

[2] DMX asserts that in imposing its $36.36 fee on commercial music service providers BMI had a monopolistic advantage; it was the only supplier.

3

(3)   Take the ▮▮▮ per-location rate in DMX's agreements with its own direct licensors (including ▮▮▮▮ when the side agreements are disregarded) as confirming the general prevalence of that rate,

(4)   Conclude that DMX's ▮▮▮ blended rate reflected in the November 4, 2005 interim extension is an out-dated outlier, no longer indicative of market conditions, and

(5)   Set the interim per-location annual fee for the adjustable blanket fee license at $25.

In the final determination of a reasonable fee, it will be necessary also to establish a reasonable "floor" amount to reflect those benefits and costs of a blanket license which are independent of its usage, and should be paid by even a licensee who has directly licensed all its music performances.   In the following discussion, that floor fee is set at ▮▮▮▮ of the full blanket fee as an interim measure, based tentatively on BMI's actual administrative expense ratio in fiscal year 2008.

2.

BMI proposes that a ▮▮▮ credit off the per-location base fee be allowed to DMX during the interim period, to account for DMX's direct licenses, with the percentage to be adjusted at six-month intervals.   As BMI stresses, the virtue of that method is its simplicity, which follows from its deferral of the practical problems of direct-licensing fee determination to the final fee proceeding.

4

DMX's proposal parallels BMI's in general, but diverges in three respects. First, it is "dynamic": DMX's actual payments to BMI will vary quarterly, depending on how much is carved out because of directly licensed performances. Second, it includes the ███████ floor fee as an integral element of the direct-license fee reduction calculation. Third, it puts the process into operation immediately.

Under DMX's proposal the amount of the annual per-location fee is calculated by applying a "direct license ratio" (the number of DMX's directly-licensed performances of works in the BMI repertory, divided by the total number of performances of works in the BMI repertory) to the blanket fee, after subtraction of the floor fee. The floor fee is subtracted from the blanket fee before application of the direct-license ratio, so that the floor fee is not diminished by the number of direct licenses, and is paid even if all of the performances are directly licensed. This protects that portion of the blanket fee which covers BMI's fixed and variable costs attributable to the adjustable blanket license.

Under this protocol, DMX's fees for each licensed location are to be calculated and paid quarterly as follows: Annual Per-Location Fee = Blanket Fee - [(Blanket Fee - Floor Fee) x Direct License Ratio].

BMI protests that this structure is complex, expensive, and disproportionate for adoption on this interim application. However, DMX's proposal offers salient practical advantages. Payments for performances that are carved out will flow directly to

5

the music publisher principals rather than through BMI.  DMX's quarterly payments to BMI will reflect the actual volume of direct licenses obtained, according to their proportion of performances of the BMI repertory.  Actual market transactions will have actual effect, providing DMX with better cash flow and the parties with practical experience which will be useful in connection with the setting of a reasonable final fee.

Two minor but significant points should be mentioned.  The first is that DMX's proposed use of its programming via satellite ("off-premises") as a proxy for all performances of its commercial music service seems pragmatic and acceptable to music publishers in the market place.  The second is that Music Reports Inc. ("MRI") which will administer the license reports to BMI from DMX, appears to be ready, experienced and reliable, with reasonable validation by BMI of its work.  On these and similar matters it seems preferable to implement the proposed system at this interim stage, so that necessary adjustments can be made before the setting of a final "reasonable" fee for the new form of blanket lease.

## Conclusion

The annual per-location rate for the adjustable fee blanket license shall, as an interim measure, be $25 per location.  DMX's proposal for the implementation of the direct licensing process shall be placed into operation, again as an interim measure subject to retroactive readjustment.

So ordered.

6

DATED:     New York, New York
           December 19, 2008


                                    _Louis L. Stanton_
                                    LOUIS L. STANTON
                                    U. S. D. J.