UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
BROADCAST MUSIC, INC.,

                Petitioner,

  - against –             08 Civ. 216 (LLS)

DMX, INC.,               **Opinion and Order**

                Respondent.
------------------------------------x

      Broadcast Music, Inc. ("BMI"), pursuant to article XIV of the BMI Consent Decree,[1] petitions for a determination of reasonable fees and terms for an adjustable-fee blanket license ("AFBL") to DMX, Inc., a member of the commercial music services ("CMS") industry, for the time period July 1, 2005 through December 31, 2012. (Tr. at 54). The AFBL will differ from BMI's traditional blanket license in allowing the licensee to reduce its fee to BMI by licensing, directly from individual music authors or their publisher-representatives, rights to perform music which is also in the BMI repertoire.

      The parties agree that the fee owed to BMI under the AFBL should be expressed as an annual per-location rate. They also agree that the AFBL should include the following components: (1) a "Blanket Fee," which is the fee that DMX would pay BMI if DMX did not directly license any of the BMI music it performed;

---

[1] <u>United States v. Broadcast Music, Inc.</u>, 1966 Trade Cases (CCH) ¶ 71,941 (S.D.N.Y. 1966), <u>as amended by</u> 1966-1 Trade Cases (CCH) ¶ 71,378 (S.D.N.Y. 1994).

(2) a "Floor Fee," which is the fee DMX would pay BMI even if DMX directly licensed all of the BMI music it performed; and (3) a "Direct License Ratio," which would reduce the Blanket Fee based on the percentage of DMX's total performances of BMI music that is directly licensed.  Thus, the Blanket Fee represents the maximum, and the Floor Fee the minimum, of the range of potential fees to BMI.  Within that range the actual annual per-location fee paid by DMX to BMI is determined by subtracting the Floor Fee from the Blanket Fee (in order to remove the Floor Fee from the reduction calculation), applying the Direct License Ratio to the remaining Blanket Fee, and subtracting the resulting amount from the original Blanket Fee.[2]

The parties disagree on what the reasonable values of the Blanket and Floor Fees are, and the scope of DMX performances to be included in the Direct License Ratio.  There is also a question whether DMX's performances of BMI music in bowling centers should fall under the AFBL or a separate, higher fee regime.

---

[2]   Annual Per-Location Fee = Blanket Fee - [(Blanket Fee - Floor Fee) x Direct License Ratio].

Background

BMI is a non-profit music licensing organization that, on behalf of approximately 400,000 affiliated songwriters, composers, and music publishers, licenses non-exclusive rights to perform publicly approximately 6.5 million musical works to a variety of music users, including CMS providers. CMS providers such as DMX provide pre-programmed music to a variety of business establishments, including restaurants, bars, hotels, offices, and retail stores. DMX is one of the largest members of the CMS industry, with approximately 70,000 customer locations.[3] DMX offers a wide variety of music across many genres to its customers.

BMI's business of licensing the public performance rights in its music is governed by the BMI Consent Decree. The Decree requires BMI to make licenses available for public performances of its music and to provide applicants with proposed license fees upon request, and prohibits BMI from "discriminating in rates or terms between licensees similarly situated" unless "business factors . . . justify different rates or terms," or preventing its affiliated writers and publishers from directly licensing their works to users such as DMX. BMI Consent Decree

---

[3] This number was due to increase by approximately 25,000 locations shortly after trial, due to gaining DirecTV as a customer. (Tr. at 897).

Arts. VIII(B), XIV(A), VIII(A), IV(A).  In 2001, the Court of Appeals for the Second Circuit held that the Decree requires BMI to offer a license performing the function of the AFBL. See United States v. Broadcast Music, Inc. (In re AEI Music Network, Inc.), 275 F.3d 168, 176-77 (2d Cir. 2001).

DMX requested that BMI provide it with a fee quote for an AFBL, which BMI did in October 2007.  The parties were unable to reach agreement, and BMI petitioned this Court on January 10, 2008.  My December 19, 2008 Memorandum and Order set interim fees at $25 per location annually, applied the reduction ("carve-out") formula, and adopted DMX's proposed Floor Fee of 11.7% and method of implementing the direct licensing process. A two-week non-jury trial concluded on February 1, 2010.


## Rate Court Approach


The general method the rate court should follow in setting a reasonable fee is well-established.  As the Second Circuit described in United States v. Broadcast Music, Inc. (In re Music Choice), 316 F.3d 189, 194 (2d Cir. 2003):

> In making a determination of reasonableness (or of a reasonable fee), the court attempts to make a determination of the fair market value— "the price that a willing buyer and a willing seller would agree to in an arm's length transaction." [ASCAP v. Showtime/The Movie Channel, 912 F.2d 563, 569 (2d Cir. 1990)].  This

determination is often facilitated by the use of
a benchmark—that is, reasoning by analogy to an
agreement reached after arms' length negotiation
between similarly situated parties.  Indeed, the
benchmark methodology is suggested by the BMI
consent decree itself, of which article VIII(A)
enjoins disparate treatment of similarly situated
licensees.

The best available benchmark may need to be adjusted to
produce a reasonable fee for the case at hand.  In a later
opinion in the same Music Choice case, 426 F.3d 91, 95 (2d Cir.
2005) the Second Circuit explained:

In choosing a benchmark and determining how it
should be adjusted, a rate court must determine
"the degree of comparability of the negotiating
parties to the parties contending in the rate
proceeding, the comparability of the rights in
question, and the similarity of the economic
circumstances affecting the earlier negotiators
and the current litigants," United States v.
ASCAP (Application of Buffalo Broad. Co., Inc.),
No. 13-95(WCC), 1993 WL 60687 at [*]18, 1993 U.S.
Dist. LEXIS 2566, at *61 (S.D.N.Y. Mar. 1, 1993),
as well as the "degree to which the assertedly
analogous market under examination reflects an
adequate degree of competition to justify
reliance on agreements that it has spawned."
Showtime, 912 F.2d at 577.

BMI bears "the burden of proof to establish the
reasonableness of the fee requested by it." BMI Consent Decree
Art. XIV(A).  Should it not do so, "then the Court shall
determine a reasonable fee based upon all the evidence." Id.

We will consider each structural component of the AFBL in
turn.

1.

The parties offer competing benchmarks for the Blanket Fee, producing strikingly different views of its reasonable value. BMI argues that the appropriate benchmark is the 2004-2009 blanket license it first made with Muzak, a competitor of DMX, and later with nearly all the others in the CMS industry except for DMX. BMI argues that benchmark is equivalent to a $36.36 annual per-location rate, which reasonably should be increased by 15% to cover the "option value" the AFBL provides over the traditional blanket license, and additional costs to BMI, yielding a proposed Blanket Fee of $41.81 per location.

DMX's proposal of a Blanket Fee of $11.32 per location separates the Fee into two components: a fee for the rights to perform the works in BMI's repertoire, and a fee to compensate BMI for the value it provides by assembling its repertoire and the benefits its blanket coverage gives to DMX. (Tr. at 1326). DMX argues that it has entered into approximately 550 direct licenses with music publishers which are appropriate benchmarks for the value of the music rights, and that they reflect a $25 annual per-location rate, of which $10 represents the portion of performances of music in BMI's repertoire. The additional value of the AFBL must then be added, which DMX contends is accounted for in the Floor Fee. Applying DMX's proposal that the Floor Fee be 11.7% of the Blanket Fee yields the $11.32 Blanket Fee.

Because BMI bears the burden of proof, we will consider its proposal first.

(a)

The 2004-2009 BMI/Muzak license was a traditional blanket license, not an AFBL.  It did not express the fees owed to BMI in per-location terms.  Rather, Muzak agreed to pay BMI a base fee of $30 million over the five-year license period ($6 million annually).  (JX-0132 ¶ 4).  Muzak had 165,000 locations on December 31, 2003.  BMI derives the $36.36 annual per-location rate by dividing the $6 million annual fee by the 165,000 Muzak locations.

The license provided for increases to the $6 million annual fee if Muzak attained certain types of growth.  If Muzak grew organically (i.e., without acquiring or merging with an existing CMS provider) at a rate up to eight percent per year, it owed no additional fees to BMI.  If it grew organically over eight percent per year it would pay BMI increased amounts, but the resulting per-location rate would decrease regardless of the amount by which Muzak's organic growth exceeded eight percent. It could potentially reach as low as $24.75.[4]  The annual fee

_____

[4] As an example of the operation of this eight percent growth allowance, in the first year of the license, Muzak could grow organically to 178,200 locations without paying additional fees. If Muzak did so, its per-location rate for that year would be

also increased if Muzak grew through acquisition or merger.  If the acquired locations had an existing license with BMI, Muzak would pay those locations' current rates.  If they did not, the acquisition was essentially considered organic growth. (Tr. at 67–68).

As part of the negotiation for their 2004–2009 agreement, BMI and Muzak also negotiated fees for the years 1994-2004, during which no blanket fee agreement had been in effect, and Muzak had simply continued to pay, and BMI had accepted without prejudice, fees set by out-dated agreements covering the years 1987–1993.  Since 1994 Muzak had been paying those interim fees at a blended rate which equated to approximately $12–$14 per location.  BMI made a series of proposals to Muzak seeking from $4.5 to $5.5 million dollars to be paid in addition to fees for 2004–2009 but spread out over that period, to recoup the past shortfall between what Muzak had paid and what BMI saw as a reasonable market rate. (JX-1164).  Ultimately BMI's and Muzak's

---

$33.67 ($6 million divided by 178,200 locations).  Any organic growth in excess of eight percent would not change Muzak's per-location rate; Muzak would pay $33.67 for each of the excess locations.  The following year, starting from its new base of 178,200 (or whatever higher number it had reached) Muzak could grow organically to 192,456 (or more) locations without paying additional fees.  If it did so, its per-location rate for the second year would be $31.18.  If its growth exceeded eight percent, it would pay $31.18 for each excess location.  If Muzak continued to grow organically at eight percent or more in each subsequent year, its per-location rate would continue to decrease in this manner, reaching as low as $24.75 in the final year of the license.

agreement in principle for the 2004-2009 license foreclosed the claimed recoupment (it deemed the terms prior to July 1, 2004 "final and . . . not subject to adjustment"), and set the BMI/Muzak 2004-2009 payments at $6 million a year ($30 million over the five years) with the above provisions for adjustments as the number of locations fluctuated. (JX-1234 at 2-6).

It is objectively obvious that BMI and Muzak took account, even if only tacitly, of the "retroactive" claim when agreeing on the future fee. A contingent liability of about five million dollars would be removed from Muzak's back, as part of its agreement to pay $30 million over five years. The jump from $12-$14 per location to $36.36 is dramatic. What was fairly priced at $12-$14 one day could hardly be fairly priced at $36.36 the next. Muzak must have recognized the force of the retroactive claim. In fact, the $36.36 per-location figure in the BMI/Muzak 2004-2009 license is no more than an arithmetical allocation of the $30 million flat fee, and as an economic matter must be understood as including a significant component for the $4.5 to $5.5 million "retroactive" claim.

Following its agreement with Muzak, BMI offered a form license to the rest of the CMS industry similar to the Muzak template. (Tr. at 324). The base fee was calculated by multiplying the CMS provider's number of locations at the start of the license by $36.36, and then by the number of years in the

license term. (JX-1291 ¶ 5(a); Tr. at 66).  The form license then operated in the same manner as the Muzak license:  annual fees were stated in flat dollar terms, the same growth provisions applied, and any past interim payments were finalized at the interim rate. (Tr. at 101).  Except for DMX, nearly the entire CMS industry accepted the form agreement (Tr. at 62–63).

BMI was not willing to negotiate the $36.36 rate because of the Decree's prohibition against discriminating between licensees similarly situated.  The only recourse for CMS providers who refused the form license was to challenge it in rate court.  BMI expressly reserved its right to seek additional retroactive payments in any such proceeding, which gave it leverage to produce agreements to its form license (RX-157; Tr. at 325–26).  Approximately half of the CMS providers who entered the form license had the same ten-year retroactive period as Muzak, and approximately one-quarter had some shorter retroactive period. (Tr. at 740–41).  Thus the CMS providers had no realistic opportunity freely to negotiate the future fees for their licenses, and I find that BMI's agreements pursuant to the form license based on the Muzak settlement are not reliable benchmarks.[5]

---

[5] It follows that BMI's argument that the reasonableness of its proposal is demonstrated by the industry-wide fees amounting to $34.32 per location for 2005-2009 is unavailing.

(b)

We now turn to DMX's direct licenses, and for the reasons stated below, find that they are appropriate benchmarks for this case.

DMX first considered obtaining music performing rights directly from music publishers in 2005, soon after it was purchased out of bankruptcy. (Tr. at 930-31).  It believed that the rates BMI and ASCAP were charging for the public performance rights to their music were not reflective of the pressures the CMS industry was facing due its increasingly competitive nature and the difficult economy. (Tr. at 894, 931-32).  DMX sought to control the cost of performance rights with its direct licenses by offering a rate to publishers that was driven by the marketplace and its economic situation. (Tr. at 934-35).

DMX's direct licenses provide for each publisher to receive from DMX its pro-rata share of a royalty pool.  The pool is calculated as an annual fee of $25 (calculated and paid quarterly at $6.25) multiplied by the number of DMX locations. The publisher's pro-rata share is the ratio of DMX's performances of that publisher's directly-licensed works to the total number of DMX performances of all works in that quarter. (JX-513 ¶ 2; Tr. at 937-38).

DMX's direct licenses are not limited to BMI music.  Thus, the $25 per-location royalty pool includes payments made on

account of performances of music which are not affiliated with BMI. DMX calculated that 40% of all its performances are of BMI affiliated music. Thus, if all DMX's performances of BMI-inventory music were done under direct licenses from its publishers, they would receive $10 annually per DMX location (40% of $25). BMI does not challenge this arithmetic.

After developing the terms for its direct licenses, DMX began approaching music publishers. DMX offered all publishers the $25 rate, and did not negotiate that number. At the time of trial, DMX had approximately 550 direct licenses. These licenses cover approximately 5500 music publishing catalogs and contain many prominent works in a wide variety of music genres.

There are four music publishers which are considered the "major" publishers. It was important to secure direct licenses with "one or two" (Tr. at 955-56) of the four major publishers to be successful in its direct licensing effort, and DMX approached each of them. DMX realized that there would be obstacles to securing a direct license with a major: most of the major publishers were on the ASCAP board, and the practice of blanket licensing was entrenched in the industry (Tr. at 956-57, 994-95). To combat that, DMX offered the major publishers non-refundable, recoupable advances of 50% over what the major publishers had been receiving from ASCAP and BMI on account of DMX performances. (Agreed Fact 53; JX-1190; Tr. at 206-07, 958-

59).   Though  the  nonrefundable  advances  were  stated  in  flat
dollar  terms,  the  $25  royalty  pool  determined  the  extent  to
which the advances were recouped.

DMX  entered  a  direct  license  with  one  major  publisher,
Sony/ATV  Music  Publishing,  Inc.  ("Sony").    The  Sony  direct
license  originally  covered  the  time  period  January  1,  2008
through December 31, 2010, with a $2.4 million advance due over
the license term (JX-449), and an additional $300,000 to cover
Sony's  administrative  and  overhead  costs  in  connection  with  the
direct  license.  (JX-1150).    Both  amounts  were  nonrefundable,  but
recoupable  through  the  $25  royalty  pool.    In  2009,  the  license
period  was  extended  through  September  30,  2012.  (JX-1170).    DMX
has  continually  increased  the  frequency  with  which  it  plays  Sony
music  since  entering  the  direct  license,  and  believes  it  will
fully  recoup  the  Sony  advance  during  the  course  of  the  license.
(Tr.  at  962).    Its  direct  license  with  a  major  like  Sony  was  an
important  inducement  for  some  other  publishers  to  sign  direct
licenses with DMX. (Agreed Fact 55).

DMX  also  negotiated  with  a  second  major  publisher,
Universal  Music  Publishing  Group  ("Universal").    DMX  made  a
series  of  proposals  to  Universal  for  a  direct  license  with  non-
refundable,  recoupable  advances.    Universal  informed  BMI  that  it
was  discussing  a  direct  license  with  DMX  and  requested  advances
from  BMI,  which  it  was  not  receiving  at  that  time.  (Tr.  at  243,

1215).  BMI offered Universal a $1.875 million guarantee in BMI royalty payments for performances by DMX of Universal music under BMI's license (rather than DMX obtaining a direct license from Universal) for the years 2008-2010. (RX-32; Agreed Fact 57).  Universal accepted BMI's offer and did not enter a direct license with DMX.

BMI challenges the use of DMX's direct licenses as benchmarks, arguing that (1) since DMX will rely on the AFBL only for the performances for which it does not have a direct license, the direct licenses and AFBL involve different sets of musical works; (2) using the direct licenses as benchmarks would not account for the publishers who declined to enter into one; and (3) the direct licenses reflect a cream-skimming bias based on "low-hanging fruit" DMX could obtain at a low per-performance cost, while utilizing the BMI license for works that are more expensive to obtain.

I find that the performance rights DMX secured through its direct licenses are sufficiently representative of the performance rights BMI provides through its blanket licenses. DMX's approximately 550 licenses provide a large enough sample to be representative. (Tr. at 1334-36).  DMX's direct licenses cover a broad scope of musical works, enabling DMX to use directly licensed music in approximately 30% of its performances

without a noticeable change in the quality of its services. (Tr. at 954-55, 1168, 1177-78).

Second, that some publishers chose not to do enter a direct license is not a reason to disregard the direct licenses as benchmarks.   There is no credible evidence that those publishers' decisions were based on the direct licenses undervaluing their music.   While that is a possibility, there are others.[6]   Some publishers may have believed it was better to remain with BMI based on their likely future distributions from BMI. (Tr. at 1336).   Rejections of the direct licenses also may have resulted simply from the blanket license practice being so well-established in the industry.

Third, the evidence is against BMI's cream-skimming argument.   It demonstrates that DMX first approached the publishers whose music it was performing most frequently, without taking into account the cost of securing licenses from them. (Tr. at 948-49).   As encapsulated by DMX's economist Dr. Adam B. Jaffe, the evidence is that "They [DMX] went after the ones that they thought were most valuable to them" (Tr. at

---

[6] Universal's Vice-President of Copyright testified that he was concerned that the royalty rate in DMX's direct license undervalued the use of Universal's music in the CMS industry (Tr. at 1207-08). However, Universal decided not to enter a direct license with DMX only after being offered $1.875 million in guarantees from BMI.

1339); there is no evidence DMX was considering per-performance transaction costs at all.

BMI points to values which are afforded by BMI blanket licenses: insurance against inadvertent infringement, indemnification from lawsuits arising from any alleged infringement arising from DMX performances, and immediate access to unregistered new works, which are not provided to the same extent by DMX's direct licenses. However, these features of BMI's blanket license provide value to DMX independent of performances of BMI music, and are appropriately accounted for in the Floor Fee. (Tr. at 1340-42).

BMI argues that DMX's license with Sony does not support a $25 per-location rate, because of the simultaneous advances DMX gave Sony.

Sony's share of the $25 per-location royalty pool determines the extent to which the advances are recouped, and if they are fully recouped, additional royalty payments are made pursuant to Sony's share of the pool. When DMX entered the license with Sony, it believed it would fully recoup the advances. Even if that does not occur, the portions not recouped are reasonably viewed as a cost of entry into the market, rather than as allocable to royalties. The blanket license practice was entrenched in the CMS industry, and DMX recognized that it would have to offer a premium to the major

publishers to entice them to enlarge the manner in which they licensed their music.

On the evidence and arguments (including others which are too speculative or inconclusive to merit discussion here), I conclude that DMX's 550 licenses at the rate of $25 per location annually are useful benchmarks for the Blanket Fee.

2.

The Floor Fee represents the value to DMX of the portion of the AFBL that is independent of the value of the music performing rights. Thus it remains constant regardless of the extent of DMX's direct licensing. This value is provided by BMI assembling its repertoire and making it available to DMX, and includes the convenience of gaining access to the entire BMI repertoire in one license, the immediate right to access new BMI works, and protection against copyright infringement.

Both parties agree that BMI's overhead costs should be included in the Floor Fee. They disagree on the proper rate for those costs. BMI proposes using its domestic overhead rate of 17%, which it applies internally to each of its CMS industry licenses. DMX argues the reasonable rate is 11.7%, which is the rate BMI announced in a 2008 press release (JX-1263), and includes both foreign and domestic performances. (Tr. at 183).

BMI has arrangements with various foreign performing rights societies to monitor and administer foreign performances of its music.     These  societies  find  and  negotiate  licenses  with establishments using BMI music, monitor the music being played in those establishments, and distribute the resulting license fees (less their own administrative fees) to BMI. (Tr. at 86–87).   These are tasks which BMI itself performs for domestic performances. (Tr. at 88).  For foreign performances, BMI simply matches the information provided by the foreign societies to its database and distributes the corresponding royalties to its affiliates. (Tr. at 88).  This results in a higher overhead rate for domestic performances, and BMI's proposal to use that rate here is reasonable.   The subject of the case is domestic performances, the whole CMS industry pays the domestic rate, and no persuasive reason appears why DMX should not.

The AFBL will be more expensive for BMI to administer than its traditional blanket license, and BMI proposes adding these incremental costs to the Floor Fee.  BMI has submitted estimates of these costs, which will be incurred by its Licensing, Performing Rights, and IT and Operations departments.  Senior vice-presidents from each of those departments testified regarding the nature and extent of the work they estimate will be required and estimated dollar amounts for each task.   DMX objects to including such unproven estimates in the fee.   The

AFBL, however, is a new form of license, which BMI has not previously offered. Thus, I do not view as unreasonable BMI's submission of estimates of the costs specific to this form of license. The estimates reflect BMI's experience in administering per-program licenses (which also involve direct licensing) in the local television industry and in administering the interim fees in this case. (Tr. at 89-91, 421-22, 433).

BMI's incremental costs can be divided into two types: the initial costs associated with establishing and implementing a system for administering the AFBL, and its routine costs of administration thereafter.

With respect to the routine costs, BMI estimates an annual administration cost of $151,000 from its Licensing and Performing Rights Departments' reviewing DMX's direct licenses, resolving issues and disputes with its affiliates, DMX and its retained administrator Music Reports, Inc. concerning the direct licenses and claimed credits, internal BMI meetings, and travel expenses. (Tr. at 90-96, 781-82). BMI estimates $37,073 in annual costs for its IT and Operations Department's manually processing data related to the direct licenses and ongoing oversight of the system it develops to administer the AFBL. (Tr. at 441). Except for $10,000 annually designated for travel expenses, which BMI's Senior Vice President of Licensing testified would likely be to industry conventions and publisher

meetings (Tr. at 193), these tasks relate to the routine administration of DMX's AFBL and their costs should be paid by DMX.

The initial costs present a more difficult question. They result from BMI's development and implementation of the systems necessary to administer the features of the AFBL which are not present in its traditional blanket licenses. BMI's IT and Operations Department will incur these costs, which BMI estimates will total $339,875. Though DMX is the first licensee with which BMI will enter an AFBL, these systems will not be solely applicable to DMX. A BMI document used to secure internal approval to begin the initial work states that providing the AFBL is a mandatory obligation and that developing it is necessary to remain competitive in the market. (Tr. at 476–77). It refers to requests for AFBLs made by licensees other than DMX (Tr. at 477–78). BMI's Vice President of IT and Operations testified that if another CMS provider requests an AFBL, it is likely that not much initial work would need to be done. (Tr. at 480–81). BMI's Senior Vice President of Licensing testified that two other CMS providers have requested an AFBL. (Tr. at 212). The developed systems are potentially applicable to other AFBL licensees. (Tr. at 478–80). The local television and commercial broadcast radio industries have requested AFBLs in petitions presently pending in this Court. See Petition for

Determination of Reasonable License Fees for Local Television Stations at 6, WPIX, Inc. v. Broadcast Music, Inc., 09 Civ. 10366 (LLS) (S.D.N.Y. filed Dec. 21, 2009); Petition for the Determination of Reasonable Final License Fees at 2, Withers Broad. Co. of Ill. v. Broadcast Music, Inc., 10 Civ. 4779 (LLS) (S.D.N.Y. filed June 18, 2010). BMI's estimate does not distinguish between costs resulting from work specifically attributable to DMX and work that could be applied to other licensees. (Tr. at 481).

Charging all the initial costs to DMX would be unfair. Simply being the first licensee to take advantage of the AFBL — which the Consent Decree mandates that BMI provide — should not require DMX to bear all the developmental costs associated with it. Those costs should be spread across the users of the AFBL.

The portion of BMI's estimated initial and developmental costs properly attributable to DMX is at this point uncertain. The proposal that DMX bear the percentage of those costs corresponding to its market share of CMS locations offers a practical solution: it roughly balances the likelihoods that not all CMS providers will seek an AFBL, but that some music users from other industries will. Given that a precise apportionment is not possible, I find this proposal to be reasonable.

3.

BMI proposes increasing the Blanket Fee by 15% on account of (1) the "option value" the AFBL provides the licensee by allowing it to reduce the fees it pays BMI by licensing works directly, while still relying on the BMI license for the works it does not directly license; and (2) the incremental costs BMI will incur in administering the AFBL.

Dr. Jaffe agrees that the AFBL is more valuable to DMX than the traditional BMI blanket license. (Tr. at 1448). However, he testified that in a competitive market, the competition among sellers causes prices of improved products to be determined by the sellers' costs, not by the increased value to the buyer. (Tr. at 1360-63). A seller can increase the price of an improved product to the extent of any increased costs associated with the improvement, plus a reasonable return on investment. (Tr. at 1360-61, 1451). He cannot increase the price beyond that (to reflect the value of the improvement) because his competition can undercut him by maintaining their own price at the cost-plus-reasonable-profit level. Thus, the improvement produces more sales, but not a higher price. The increased costs of the AFBL have been taken into account in the Floor Fee. There being no evidence in the record of the amount of the

"reasonable return" on these costs, I will increase the Blanket Fee by 10% of the incremental costs awarded to BMI.[7]

### 4.

Having determined the components of the Blanket and Floor Fees, those fees must now be calculated. First, the Floor Fee's 17% overhead component must be quantified as a per-location amount. BMI's income per location is $36.36 of which 17% or $6.18 is overhead and that is the amount which should be included in the Floor Fee.

Next, BMI's incremental costs must be converted into per-location terms. For the routine costs, this is straightforward. Having excluded the $10,000 annually designated for travel expenses, $178,073 in ongoing costs remain. Dividing by the

---

[7] BMI proposed as benchmarks for the option value the local television industry's per-program licenses. Like the AFBL, per-program licenses allow television stations to reduce their license fees by directly licensing music which they perform. In an ASCAP rate court proceeding which set fees for both a blanket and per-program license, Magistrate Judge Dolinger set the per-program license fee at 133% of the blanket license fee. United States v. ASCAP (Application of Buffalo Broad. Co., Inc.), No. 13-95 (WCC), 1993 WL 60687, at *67 (S.D.N.Y. Mar. 1, 1993). Judge Dolinger was pricing the two licenses so that the "most typical station" would have an equal "basic fee" under both licenses. Id. at *68. Because the typical TV station used ASCAP music in approximately only 75% of its programs, Judge Dolinger set the per-program fee higher, to prevent an inequality in fees paid by two typical stations, one of which used per-program licensing, and the other using the blanket license. See id. at *67-*68. The situation which required that adjustment has no parallel in this case.

number of DMX locations on which BMI's fee proposal is based —
74,779 (Tr. at 55) — gives a per-location rate of $2.38.

For the initial costs, DMX's market share of CMS
prospective AFBL users must be calculated.  The 74,779 location
count is as of 2008 (BMI Apr. 21, 2010 Mem. at 4).  In 2008, BMI
had 376,236 CMS locations licensed, not including DMX (JX-1293
at 12).  Thus, DMX's 2008 market share equals 74,779 divided by
(74,779 + 376,236), or approximately 16.6%.  Multiplying by the
$339,875 in total initial costs yields $56,419.25 to be charged
to DMX.  Spread out over the seven and a half year period from
July 1, 2005 to December 31, 2012, this equates to $7522.57
annually, or approximately $0.10 per-location.

Those three items:  $6.18 for overhead, $0.10 for
developmental costs, and $2.38 for routine costs, equal $8.66
and comprise the per-location Floor Fee.

Two more items are added to reach the per-location Blanket
Fee:  $0.25 return on investment in the incremental costs, and
$10 music fee.  The per-location Blanket Fee thus equals $18.91.


5.

The parties agree on the general structure of the Direct
License Ratio, but disagree on the scope of performances to be
included in it and other issues.

(a)

DMX delivers music to each of its customers in either of two ways:  off-premises or on-premises.  Off-premises deliveries are via satellite transmission:  each customer has a DMX device installed at its establishment which receives the signal and plays the music.  On-premises deliveries are either on a disc or by sending programming data over the internet to be stored on the devices' hard drives, in either method to DMX devices installed at the customers' establishments.  Approximately 65 percent of DMX's locations are on-premises, and approximately 35 percent are off-premises.  BMI proposes using data from both the on-premises and off-premises locations to calculate the Direct License Ratio.  DMX proposes calculating the ratio by using its off-premises performances as a proxy for all performances.  Each of DMX's direct licenses uses this proxy to calculate the fees due to the publisher. (Tr. at 937-38; JX-513 ¶¶ 1(a), 2(b)).

The manner in which DMX reports music use to BMI differs between the two delivery methods.  DMX has approximately 110 pre-programmed off-premises channels, each of which is available to almost all of its off-premises customers. (Tr. at 889, 1158-59).  DMX reports to BMI the musical works broadcast over the satellite — in other words, the identity of each piece of music that is broadcast on each of the off-premises channels, without regard to what customers are actually listening to.   If a

particular work is broadcast multiple times, each broadcast is reported. (Tr. at 964-65).  For its on-premises service, DMX has approximately 140 programs.  There are programs corresponding to nearly every off-premises channel; corresponding channels and programs feature nearly all of the same songs. (Tr. at 1162-63). On-premises customers, however, must select the specific programs to be made available to them, with most receiving no more than ten. (Tr. at 889-90).  In its on-premises music use reports, DMX provides to BMI the identity of the songs sent to its on-premises customers' equipment; the frequency with which the songs are programmed to be performed is not furnished. (Tr. at 966-67).  In addition to its pre-programmed channels and programs, DMX offers customers the option of receiving custom programming, where the music is selected specifically for the particular customer.  Approximately 30% of DMX's locations receive custom programming, most by on-premises delivery.

DMX's proposal has the practical advantage that it does not require structuring the Direct License Ratio to account for the differences in the two types of reported data.  BMI contends that the on-premises data should nonetheless be included for several reasons:  (1) DMX uses different music in its on- and off-premises services; (2) since on-premises customers must select the music they want to receive, the on-premises data better reflects which songs are actually played by customers;

and (3) a higher percentage of off-premises performances are directly licensed.

Regarding the first two points, that DMX's off-premises performance data is a sufficiently accurate proxy for the total body of musical works played by DMX's customers is demonstrated by each of the publishers who entered a direct license accepting it. As explained above, a majority of DMX's on-premises programs simply correspond to, and play nearly the same songs as, its off-premises channels. In fact, according to the evidence BMI offered to demonstrate the differences in music use, only 14% of the total works performed by DMX appear solely on its on-premises service. (PX-200).

With respect to the discrepancy in the percentage of directly licensed music, BMI primarily relies on its comparison of the data contained in DMX's music use reports for the second quarter of 2009, which shows that 36.64% of the entries in the off-premises report were directly licensed, compared to 21.4% in the on-premises report. (PX-201). No definitive conclusion can be drawn from this data. DMX has increased the frequency with which it performs directly licensed music. Thus, because only the off-premises reports account for the number of times a particular song is performed, it is unsurprising that directly licensed works appear more frequently in them.

BMI also established that DMX for a period of time changed the programming on certain of its off-premises channels to contain more directly licensed works from 2:00 A.M. to 5:00 A.M., and did not do so on any on-premises programs.  DMX, however, found this practice to be ineffective and ended it.  Moreover, there is evidence regarding DMX's differing treatment of its on- and off-premises services which points in the opposite direction.  DMX created five channels containing 100% directly licensed music, which were each initially available to both on-premises and off-premises locations.  DMX has since removed two of the channels from its off-premises programming, while all five remain available by on-premises delivery. (Tr. at 1173).

In sum, DMX's off-premises performance data is acceptable to DMX's customers as a sufficiently accurate proxy, and there is no weight of evidence establishing that it is not.  Including the on-premises data would defeat the proxy's practical advantage of not having to account for the differences in the two sets of data DMX reports to BMI.

(b)

The parties dispute whether direct license credits claimed by DMX for performances of foreign works licensed by BMI through an agreement with a foreign performing rights society should be

presumed to include the writer's share in addition to the publisher's share. BMI proposes that only the publisher's share be included unless DMX provided it with evidence that the writer's share was intended to be directly licensed, because there is a general uncertainty whether publishers have the right to directly license a foreign writer's share. DMX proposes that the writer's share be credited unless BMI is notified by the foreign society that the direct license does not cover the writer's share. In its pre-trial brief, DMX states that the publishers have represented to it that they have the right to grant DMX permission to perform the foreign writers' works. (DMX Br. at 63). The trial testimony reveals that Sony, after entering its direct license with DMX, represented to BMI that it had the right to enter into a direct license on behalf of both their domestic and foreign writers, and BMI accepted those representations. (Tr. at 608-09). DMX should likewise be entitled to rely on the representations it has received from publishers. In circumstances where such permission is not assumed as a matter of course, BMI should accept DMX's representation that it has in fact been obtained.

(c)

DMX performs some works for which neither party knows the identity of the relevant rights-holders. The parties agree that

the burden of identifying the unknown rights-holders should be shared between them, and that a percentage of these unidentified works should be counted as BMI works in the denominator of the Direct License Ratio, but disagree on the reasonable value of that percentage.  BMI proposes treating 50% of the unidentified works as BMI works.  That is unreasonable.  BMI's share of DMX performances of identified works is only 40% — thus, under BMI's proposal, it is a benefit to BMI for works to remain unidentified, but a detriment to DMX.  Setting the percentage at less than 40% would have the opposite effect.  Thus, counting 40% of unidentified works as BMI works is the best solution.

### (d)

The parties disagree on the schedule for DMX to report its music use, pay its license fees and provide copies of new direct licenses to BMI.[8]  BMI proposes a monthly schedule, with the relevant reports and payments due within 30 days of the end of each relevant month.  DMX proposes to maintain the parties' interim schedule:  quarterly reporting and payments, with the reports and payments due 45 days after the close of each quarter.  In light of the trial testimony that BMI does not distribute payments to its affiliates for CMS industry

---

[8]  This issue was not addressed at trial, but was raised in subsequent letters to the Court dated March 2, 2010 from BMI and March 4, 2010 from DMX.

performances until approximately seven to nine months after the performance dates (Tr. at 604), I see no reason to deviate from the currently implemented schedule.

DMX objects to BMI's proposal that performances of directly licensed music not be credited in the Direct License Ratio until DMX has provided BMI a copy of the relevant direct license. DMX contends that the crediting should begin on the effective date of the direct license, and that BMI's proposal will lead to double payment (to the directly licensed publisher and BMI) between the effective date and delivery date. I agree with DMX. Under the above quarterly schedule, DMX will provide BMI with any new direct licenses at the same time the first credits under those licenses are claimed. This avoids the double payment problem, and is not discernibly prejudicial to BMI.

6.

Bowling centers are not within the scope of BMI's 2004-2009 CMS industry licenses, although DMX's licenses do not exclude them. BMI licenses bowling centers either individually or through the Bowling Proprietors Association of America ("BPAA"). The BPAA "represents the majority of bowling centers nationwide" (Tr. at 526), and BMI proposes using its BPAA agreement as a benchmark. In 2009, bowling centers licensed under that

agreement paid $14.40 per lane.[9]   The average bowling center has about 24 lanes (Tr. at 529).   Thus, the average BPAA bowling center paid approximately $345.60 in fees ($14.40 x 24) to BMI in 2009.   BMI argues that this higher rate is appropriate for bowling centers because they use music more intensively and as a more central part of their business than other establishments serviced by CMS providers, whose music is background music. Bowling centers have evolved to use of rock-and-roll played very loud, to attract customers and as part of a "cosmic bowling" experience.

DMX proposes that BMI's AFBL be required to cover bowling centers, at the same rate DMX pays BMI for its other locations.

The analysis by which I adopted DMX's rates for the CMS industry does not apply equally to bowling centers, nor justify a drop in BMI's industry-negotiated bowling centers' fees from $345.60 per location to $18.91.   The matter is not sufficiently developed, particularly in light of other rulings made herein, to allow the setting of other than the existing terms with respect to this special business.

---

[9] The 2009 rate for individually licensed centers was $26.60 per lane.   The lower BPAA rate reflects a volume discount. (Agreed Facts 64–65).

## Conclusion

The AFBL between BMI and DMX shall have an annual Blanket Fee of $18.91 per location and an annual Floor Fee of $8.66 per location. The Direct License Ratio shall be calculated using DMX's off-premises performances as a proxy for all of its performances. So much of the petition as seeks inclusion of bowling centers in the AFBL is denied.

So ordered.


DATED:    New York, New York
          July 14, 2010


                                        *Louis L. Stanton*
                              LOUIS L. STANTON
                                 U.S.D.J